# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| PAUL C. CLARK; REBECCA DELORME; | ) | |
| PAUL C. CLARK, JR., a minor, by and through | ) | |
| his parents and legal guardians, PAUL CLARK | ) | |
| and REBECCA DELORME | ) | |
| 100 Harborview Drive | ) | |
| Penthouse 4A | ) | |
| Baltimore, Maryland 21230 | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| 100 HARBORVIEW DRIVE COUNCIL | ) | |
| OF UNIT OWNERS D/B/A | ) | |
| 100 HARBORVIEW DRIVE | ) | Civil Action No._____ |
| CONDOMINIUM ASSOCIATION | ) | |
| 100 Harborview Drive | ) | |
| Baltimore, Maryland 21230 | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| ZALCO REALTY INC. | ) | |
| 8701 Georgia Avenue | ) | |
| Third Floor | ) | |
| Silver Spring, Maryland 20910 | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| JOHN H. COCHRAN | ) | |
| 100 Harborview Drive | ) | |
| Penthouse 3C | ) | |
| Baltimore, Maryland 21230 | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |
| _____ | ) | |

**COMPLAINT FOR MONETARY, DECLARATORY AND
INJUNCTIVE RELIEF**

**INTRODUCTION**

1.   Plaintiffs purchased a condominium in the Harborview Tower Condominiums, a/k/a 100 Harborview Drive Condominiums, located at 100 Harborview Drive, Baltimore, Maryland ("Harborview" or the "Condominium").  Less than five months after they moved into their new home, Plaintiffs were forced to move out due to Defendants' failure and refusal to repair and remediate defects in the common elements which directly and substantially adversely affected the habitability of Plaintiffs' unit.  More than four years later, Plaintiffs still are precluded from living in their home due to Defendants' ongoing unlawful acts and practices.

2.   During the short time Plaintiffs were able to reside in their new home at Harborview, they were subjected to discrimination on the basis of their familial status and race.  During this time, and since being forced to move out, Plaintiffs have been subjected to a pattern of coercion, intimidation, threats, interference, and retaliation.

3.   Through this action, Plaintiffs seek monetary, declaratory, and injunctive relief against Defendants (1) for discrimination based on familial status and race and (2) for coercing, intimidating, threatening, interfering with, or retaliating against Plaintiffs in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 *et seq.*

2

## JURISDICTION AND VENUE

4.      Jurisdiction is conferred on this Court by 42 U.S.C. § 3613 and by 28 U.S.C. §§ 1331 and 1343(a)(4).

5.      This Court also has jurisdiction to grant the Declaratory relief sought in this action under 28 U.S.C. § 2201.

6.      Venue in this Court is proper under 28 U.S.C. § 1391(b) because the events giving rise to the claims alleged herein occurred in Baltimore, Maryland.

## PARTIES

7.      Plaintiffs Paul C. Clark ("Clark") and Rebecca Delorme ("Delorme") are a Caucasian married couple who reside in Baltimore, Maryland with their minor child, Paul C. Clark, Jr.  Clark is the owner of a condominium at Harborview, a unit he purchased for his family but in which Plaintiffs have not been able to live for approximately four and one half years because of Defendants' unlawful acts.

8.      Defendant 100 Harborview Drive Council of Unit Owners d/b/a 100 Harborview Drive Condominium Association (the "Council") is an unincorporated entity, organized under the laws of the State of Maryland.  The Council is comprised of all the unit owners of Harborview and is responsible for governing the affairs of the Condominium.  The Council is administered by and through a Board of Directors (the "Board").  All members of the Board are Caucasian.

9.      Defendant Zalco Realty Inc. ("Zalco") is a corporation incorporated under the laws of the State of Maryland.  Zalco is a real estate management firm which, at all times relevant hereto, was the

management firm employed by the Board to oversee the day-to-day operation and management of the Condominium.

10.     Defendant John H. Cochran ("Cochran") is a Caucasian male who owns and resides in a condominium at Harborview.  Cochran has been a member of the Harborview Board of Directors since 2008.  Beginning in or about March 2010, Cochran has served as President of the Board.  Pursuant to the Harborview bylaws, the President is the "chief executive officer of the Council" whereby he has the "power of the general management and direction of the affairs of the Council."

## FACTS

11.     On or about October 27, 2009, Clark purchased condominium unit PH4A in Harborview for him and his family to live in.

12.     Shortly thereafter, in early November 2009, Clark and Delorme moved into their new home with their son, Paul Clark, Jr., who was five years old at the time.

13.     Before Plaintiffs moved into what they expected to be their dream home, Clark and Delorme were informed by Giselle Rivera, an individual employed by Defendant Zalco to act as general manager for the Condominium, that their neighbor who owns and lives in the condominium immediately below Plaintiffs' condominium, Guy Flynn, who is African American, had expressed concern, even before Plaintiffs had moved in, about the amount of noise a 5 year old child would make.  Also before Plaintiffs moved into their new home at Harborview, Clark was informed by front desk personnel at Harborview of a noise complaint.

14.     As a result of Mr. Flynn's concerns, Ms. Rivera asked Plaintiffs where Plaintiffs' son would sleep, where he would play, etc.

15.     Mr. Flynn also shared his concerns about the potential noise that Plaintiffs' son would make in an email to Mollie Mezrich who was the President of the Board of Directors when Plaintiffs moved into Harborview.  In his email to Ms. Mezrich, who forwarded the email to the other members of the Board, Mr. Flynn stated "[y]ou can imagine the **shudders** [emphasis added] that run down my spine when considering how THAT will work out with regard to child noises, running/jumping around, etc. once they move in."  Mr. Flynn also inquired in his email to Ms. Mezrich whether the Council had any "Tower-specific rules, by-laws, best practices and/or customs to which owners may resort in the case of children living in an above unit?  For example do we have rules regarding kids or ancillary requirements for children-occupied units regarding flooring/carpeting, prohibitions on excessive running around, quiet times, etc.?"

16.     In her email forwarding Mr. Flynn's email to the other Board members, Ms. Mezrich stated that Mr. Flynn's concerns reminded her that there had been instances "where we have had children running wildly in the elevator, hallways and in the common areas, climbing on the window sills overlooking the pool, behaving rambunctiously around the pool area, running wildly in the lobby, pulling fire alarms."  Ms. Mezrich also indicated that other owners had asked her "if we have a policy describing rules parents should follow with their children in our high-rise building" remarking that "[t]his may be something we do need to have a policy for."

17.     In a subsequent email to the Board, Ms. Mezrich stated that an owner had approached her with a request "for rules regarding children in the building because she [the owner] was disturbed by" another little boy who resides in the building "and the DeLorme-Clark little boy who run around the common areas (with parents watching them) tear up the place."  Ms. Mezrich then stated that "[t]he little boy's reputation for being somewhat of an unsupervised child obviously has preceded him."

5

18.     Immediately after Plaintiffs moved into their new home, Mr. Flynn began complaining regularly via email to the Condominium management staff and members of the Board about what he characterized as excessive noise created by Plaintiffs' son.  In response, the Harborview front desk staff repeatedly called Plaintiffs and went and knocked on the door of Plaintiffs' unit, asking Plaintiffs' to keep their son from making too much noise even though the staff admitted to Plaintiffs that they could not hear any noise coming from Plaintiffs' unit in the hall outside Plaintiffs' unit.

19.     Mr. Flynn's emails became increasingly hostile in tone as he described what he and his wife were allegedly experiencing in terms of both emotional and physical distress, which, according to Mr. Flynn, was "hard to overstate," as a result of this 5 year old child having "free reign" to run and bounce and bang on walls, etc.  Mr. Flynn even described the Plaintiffs' home as becoming a "tot lot" because, occasionally, Plaintiffs' son would have another child from the building over for a play date.

20.     Mr. Flynn, on more than one occasion, suggested that, in the absence of any existing rules or policies, the Board should consider implementing rules specifically governing "children-occupied units."

21.     In addition to their hostile tone, Mr. Flynn's emails took on an increasingly threatening tone, stating that if the Board did not adequately address the "excessive noise" allegedly being made by Plaintiffs' child, he would use any means at his disposal, including seeking legal redress, in order to achieve his stated goal of silencing the child.

22.     Defendants never made any real, or meaningful, attempts to investigate or independently verify the degree to which Mr. Flynn's complaints had merit beyond calling Plaintiffs or knocking on their door to tell them they had to keep their son from making too much noise.

23.     Rather, on or about December 31, 2009, Ms. Rivera sent a letter to Plaintiffs with the heading **"HEARING NOTICE"** informing Plaintiffs that the Board had requested that they appear at a hearing on January 12, 2010 to address Mr. Flynn's allegations of excessive noise made by Plaintiffs' son.  The Notice also stated that Plaintiffs would "be given a reasonable opportunity to be heard" at the hearing.

24.     In response, on or about January 3, 2010, Delorme sent a letter to Ms. Rivera pointing out that Defendants had failed to meet the criteria set forth in the Condominium bylaws with respect to holding a formal hearing.  Delorme also informed Ms. Rivera that, regardless, neither she nor Clark were available on the designated date.

25.     On or about January 12, 2010, *nine* days *after* Delorme's letter and the date on which the hearing was scheduled, Ms.  Rivera sent a letter to Delorme acknowledging that Delorme was correct with respect to Defendants' failure to meet the criteria for scheduling a formal hearing.  However, Ms. Rivera attempted to explain that Defendants had not really intended to hold a formal hearing.  Rather, according to Ms. Rivera, Defendants merely intended to "create a forum for mediation" to see if the parties could resolve the situation.  Therefore, even though the Board was aware Plaintiffs were not available on January 12, 2010, the Board intended to go forward and allow Mr. Flynn to make his presentation to the Board.

26.     On the evening of January 12, 2010, Defendants held their "hearing."  Mr. Flynn, accompanied by one or more attorneys, appeared and made his presentation regarding his complaints with respect to Plaintiffs' son and the alleged "excessive noise" he continued to make.

27.     Notwithstanding their statement to the contrary, Defendants never scheduled, nor attempted to schedule, a date on which Plaintiffs could make their own presentation.  Instead, on

January 19, 2010, Defendants took the extraordinary step of issuing a Cease and Desist letter to

Plaintiffs stating that, as a result of all the noise created by their son, they were in violation of several

cited provisions of the Condominium bylaws and that they had 30 days within which to take steps to

remedy the situation.  Among the suggestions Defendants made regarding ways Plaintiffs could remedy

the situation was to find a "new place for the child or children to play."

28.     On or about January 28, 2010, Plaintiffs filed a discrimination complaint with the U. S.

Department of Housing and Urban Development ("HUD") alleging discrimination under the Fair

Housing Act ("FHA") on the basis of familial status.  In accordance with the FHA, HUD referred the

complaint to the Maryland Commission on Human Relations, a substantially equivalent agency under

the FHA.

29.     After they filed their discrimination complaint, Plaintiffs were subjected, by Defendants

and other unit owners, to a pattern of harassment, humiliation, retaliation, threats and interference with

their right to reside in, and enjoy, their home.

30.     Information regarding Plaintiffs' discrimination complaint, including Plaintiffs' names

and address, was regularly made public at Board meetings during which members of the Board,

particularly Defendant Cochran, would identify Plaintiffs when discussing the filing and on-going

investigation of Plaintiffs' discrimination complaint.  If Plaintiffs attended a meeting, Defendant

Cochran or another member of the Board would expressly note their presence.

31.     In addition, information regarding Plaintiffs' discrimination complaint was published in a

monthly newsletter produced and disseminated by the Board known as the *Tower Topics*.

32.     *Tower Topics* is sent to all of the residents at Harborview by either email or regular mail.

*Tower Topics* is also posted throughout the building and on the Harborview website, access to which,

until recently, was not restricted to Harborview owners and tenants.  In addition, *Tower Topics* was, for a time, also distributed to realtors who sell or lease condominiums in the Baltimore Inner Harbor area.

33.     In April 2010, less than three months *after* Plaintiffs had filed their discrimination complaint, and *after* Defendant Cochran became President of the Board, Defendants, for the first time since the Board began publishing the *Tower Topics*, started including a section, eventually entitled *Litigation Update*, in which Defendants provided updates on litigation in which the Council was involved, including Plaintiffs' discrimination complaint.

34.     In the first *Tower Topics* in which Defendants reported information regarding litigation in which the Council was involved, Defendants disclosed information about three matters that had been filed, two of which had been filed by families with children.  One of those two matters related to Plaintiffs' discrimination complaint.  Defendants offered owners who were interested an opportunity to purchase a copy of each claim mentioned, including Plaintiffs' discrimination complaint.

35.     Although Defendants regularly published information on Plaintiffs' discrimination complaint in the *Litigation Update* section, they have not published information about all other lawsuits that have been filed against the Council.

36.     In addition to publishing information about, and commenting on, Plaintiffs' discrimination complaint in the *Tower Topics* newsletter, Defendants have published such information in one or more of the *Updates* that the Board periodically produces and disseminates, separate and apart from the monthly *Tower Topics*.

37.     The Board has also published detailed information regarding Plaintiffs' discrimination complaint in at least two of its Annual Reports.

38.     Management prepares and disseminates an *eBulletin* which is an email blast sent to all Harborview owners or tenants who have subscribed.  Plaintiffs' names, address and information regarding the filing of their discrimination complaint have also been included in some of these *eBulletins*.

39.     Defendants also retained a public relations firm for the purpose of creating both traditional press releases and so-called "faux press releases" regarding Plaintiffs and their activities related to their efforts to reside in, or return to, their home.  A *faux press release* is information written in the form of a news release but which does not get released to the media.  Rather, in this instance, the information was posted on the Harborview website in a newly created *news section*.

40.     As a direct result of these multiple and detailed disclosures, Defendants have created a hostile environment in which Plaintiffs, particularly Delorme and her son, have been verbally assaulted and harassed by other residents.  For example, Delorme has been accosted and verbally assaulted by an angry resident in the garage, as well as in the building lobby while with her son.  Delorme has also heard other residents refer to her son as a "brat."

41.     Delorme's parents, who are also residents at Harborview, although Delorme's father has recently passed away, have been subjected to negative comments from other residents about their daughter and her family. In addition, Delorme and her mother, have received threatening phone calls.

42.     After being forced to move out of Harborview, Plaintiffs' son suffered from distress and anxiety thinking that, because of all the noise complaints, he was the cause of Plaintiffs having to move out.

43.     Not long after Plaintiffs filed their discrimination complaint in January 2010, they discovered that the length of time during which water had been infiltrating their unit, as well as the

10

magnitude of the cause of the water infiltration of their unit, was much greater than had been previously disclosed to Plaintiffs.  The water infiltration was caused by defects in the Condominium's roof system, exterior façade, and other exterior common elements.

44.     Plaintiffs immediately notified Defendants of their discovery, requesting that Defendants take immediate action to remedy the situation.  However, Defendants did not take any steps to address the problem.

45.     Concerned about the possible presence of mold and the effect it may have on the quality of the air, particularly on their young son, Plaintiffs retained MMTS Environmental ("MMTS"), a company that specializes in testing for mold and mildew.  According to MMTS' findings, the water penetration had caused, and was continuing to cause, extensive damage to Plaintiffs' unit.  In addition, their home tested positive for high concentrations of toxic mold.

46.     Due to these findings, and due to the fact that Defendants were not taking substantive steps to remedy the problems with the common elements which were directly causing the damage to Plaintiffs' unit, Plaintiffs were forced to move out of their home on or about March 22, 2010.

47.     Only two units of the several units affected by the defective roof, exterior façade and other defective common elements have not been remediated – Plaintiffs' unit and unit PH4C.  In addition, Plaintiffs and the owner of unit PH4C are the only owners of the affected owners who have children and who were forced to move out of their units because of the damage to their units from the defective common elements.

48.     Despite numerous requests by Plaintiffs and the owner of unit PH4C, Defendants have failed to repair and remediate the identified defects which are the cause of the water infiltration and mold contamination, rendering the units of both Plaintiffs and the owner of PH4C totally uninhabitable.

11

49.     The Council has also failed to comply with an arbitration award in favor of the owner of unit PH4C, confirmed by the Circuit Court for Baltimore City, to make required repairs to Harborview's roof, exterior façade and other common elements by December 30, 2013, a failure with respect to which the Council has been held in civil contempt.

50.     During the more than four years that have elapsed since Plaintiffs were forced from their home, water has continued to infiltrate, and mold continues to contaminate, Plaintiffs' unit.  In addition, Plaintiffs have discovered that water leaking into their unit is now contaminated with harmful toxins from pigeon feces.  As a result, Plaintiffs' unit remains completely uninhabitable.

51.     Even if Defendants ultimately make all necessary repairs, both to the defective common elements and to the interior of Plaintiffs' unit, because of the very hostile environment Defendants have created, and continue to perpetuate, it will be extremely difficult for Plaintiffs to return to their home and be able to peacefully enjoy living there.

52.     Defendants' failure to make the necessary repairs to the common elements and to Plaintiffs' unit is retaliation for the Plaintiffs exercising, or attempting to exercise, their rights under the FHA.

53.     Defendants' retaliation against Plaintiffs is also evidenced by Defendant Council's admission that, notwithstanding the civil contempt holding, it does not intend to comply with the construction deadlines or the scope of work set forth in the confirmed arbitration award obtained by the owner of unit PH4C, at least not before it redecorates the lobby.

54.     As a result of Defendant's failure to repair Harborview's roof and other defective common elements and the substantial damage caused to Plaintiffs' unit thereby, Plaintiffs' unit

continues to deteriorate and lose value even while Plaintiffs continue to pay their monthly condominium dues, real estate taxes, and their mortgage loan.

55.     Since Plaintiffs were forced to move out in March 2010, they have lived in a condominium in an adjacent complex, which is 75% smaller than their condominium at Harborview.  As a result, Plaintiffs have incurred, and continue to incur, significant costs in connection with their second condominium.

56.     Plaintiffs have visited Harborview since they were forced to move from there to see and care for Delorme's parents.  However, as a direct result of Defendants' actions in publicizing information about Plaintiffs' discrimination complaint and other efforts to return to their home to enjoy where they had chosen to live, Delorme has often encountered other unit owners who have harassed her, or otherwise made her feel intimidated or unwelcome while visiting her parents.  This has caused Delorme to suffer significant anxiety and emotional distress.

57.     Plaintiffs have also gone to Harborview to provide access to their unit to Defendants and their various contractors.  On one occasion, Delorme met a roofing contractor in the lobby for the purpose of letting him into Plaintiffs' unit.  However, Delorme had the humiliating experience of being forced to wait in the lobby for the arrival of a Baltimore City Police Officer who had been hired by Defendants to escort Plaintiff to her unit.  Since the Police Officer was detained at a crime scene, the contractor with whom Delorme was meeting had to obtain explicit permission from Defendant Cochran to allow Delorme to accompany the contractor to *her* unit without the police escort.

58.     In addition to visiting her parents and providing access to various contactors, Delorme sometimes took her son over to Harborview to play with another boy who resided there and with whom Plaintiffs' son was friends.

59.     On or about May 7, 2011, Delorme and her son were at Harborview visiting this friend.

60.      During their visit, Delorme, the two boys, and the other boy's mother, entered the pool area, not the pool.  Although the pool was closed, there were no signs or other indications that the area around the pool was off limits even if the pool, itself, was closed.  In fact, there was a group of young people having a party on the patio outside the pool area and there were people coming and going through the pool area.

61.     On or about May 10, 2011, without speaking with Delorme or the other mother, Defendants, again, took the extraordinary step of issuing a Cease and Desist letter, this time to both Delorme and the other boy's parents.  This letter informed them that they had violated a provision of the bylaws that prohibits "use of the pool" when there is no attendant on duty.  The letter directed them to immediately cease and desist from entering the pool and it set forth the sanctions that may be imposed, including levying fines and sending a copy of the Cease and Desist letter to their respective mortgage companies.

62.     Despite being told that the group of young people, who were having their party on the pool patio at the same time Delorme, the two boys, and the other boy's mother were in the pool area, had been drinking out of glass containers (a violation of Condominium rules), Defendants did not issue a Cease and Desist letter to these people.  In fact, the only Cease and Desist letters issued by Defendants during the years 2009, 2010 and 2011 were to families with children.

63.     Shortly after Defendants issued the May 2011 Cease and Desist letter, Plaintiffs filed another discrimination complaint with HUD, this time on the basis of familial status *and* retaliation.

64.     Following the filing of this complaint, Defendants continued to engage in a pattern of harassment, humiliation, retaliation, threats, and interference with Plaintiffs' right to reside in their home.

65.     Since the filing of their second discrimination complaint, Defendants have maintained and perpetuated the hostile environment Defendants had already created by continuing to make public, or to publicize, through one or more of the mediums previously identified, information relating to Plaintiffs' second discrimination complaint, including Plaintiffs' names and address.

66.     As a direct result, Plaintiffs feel they need to avoid going to Harborview as much as possible in order to avoid being harassed, verbally abused, or otherwise intimidated, even though Delorme's mother continues to reside there.

67.     To avoid the hostile environment created by Defendants through their practice of discussing Plaintiffs and their fair housing protected activities at Board meetings, as well as making a point of explicitly calling attention to Plaintiffs' presence when they attended a meeting, Plaintiffs have attempted to have an agent, sometimes an attorney or someone from their attorney's office, attend meetings on their behalf.

68.     However, in or around May 2013, the Board adopted Policy Resolution No. 2013-01 which prohibited "[a]ll members, employees, or agents of" five specifically identified law firms from attending "any and all Meetings of the Council."  All five of the identified law firms are firms representing either Plaintiffs or the owner of unit PH4C.

69.     On or about November 5, 2013, Defendants revised Policy Resolution No. 2013-01, and adopted Policy Resolution No. 2013-1 (Revision No. 1), to prohibit "[a]ll past or present members, employees, or agents of" six specifically identified law firms "from attending any meetings of the

Council,…any meetings of the Board of Directors,…any meetings of any of the committees of the Council or Board of Directors, and…any social events held by the Council or the Board of Directors." Not only did the revised resolution expand the scope of the class of people associated with the identified law firms prohibited from attending any meeting from "all members, employees, or agents" to "all **past or present** [emphasis added] members, employees, or agents," it also added a sixth law firm.  This newly identified law firm is one representing Plaintiffs.

70.     As a direct result of this policy, Plaintiffs cannot have one of their attorneys, or anyone associated with any of the identified law firms, attend a Board of Directors, or other Council, meeting on their behalf.  Nor, apparently, can Plaintiffs have someone *not* affiliated with any of the specified law firms attend meetings on their behalf since, when they had such a person attend a meeting, the person was physically removed from the premises.  Therefore, this policy has the effect of excluding Plaintiffs from attending any Council or Board meetings since, if they do, they have a reasonable basis to believe they will be subjected to harassment and humiliation.

71.     Since this policy applies only to Plaintiffs and the owner of unit PH4C, who also has children and who also has been displaced from his home as a result of Defendants' failure or refusal to make all necessary and mandated repairs to the Condominium's exterior common elements, the policy is clearly in retaliation for Plaintiffs and the owner of unit PH4C exercising, or attempting to exercise, their right to live in the home of their choosing.

72.     The policy is also clearly intended to try to intimidate, harass, or coerce Plaintiffs.

73.     Because of this on-going harassment, intimidation, interference, coercion, retaliation and humiliation, and because of emails like the one sent by Mr. Flynn to Harborview management and Defendant Cochran on April 22, 2013, complaining about, inter alia, loud noises emanating from

Plaintiffs' unit (despite the fact Plaintiffs do not currently reside in their unit at Harborview), including those created by "a child running about during the dinner hours and thereafter" on two separate occasions "notwithstanding the current and standing Cease and Desist Order which was previously issued against" Plaintiffs, Plaintiffs continue to feel they are not welcome at Harborview because they have a child.

### EFFECT OF DISCRIMINATORY BEHAVIOR

74.     As a result of Defendants' unlawful acts and practices, Plaintiffs have suffered, are continuing to suffer, and will suffer in the future great and irreparable loss and injury including, but not limited to, deprivation of the full use and enjoyment of their home, loss of value of their home, other financial loss, severe emotional distress, physical injury, humiliation, embarrassment, mental anguish, feelings of nervousness, anger and discouragement.

75.     In engaging in the unlawful conduct described above, Defendants have acted intentionally, maliciously, and/or with reckless disregard to deprive Plaintiffs of their statutorily protected rights under the Fair Housing Act.  Accordingly, Plaintiffs are entitled to punitive damages.

76.     There exists an actual controversy between the parties regarding Defendants' duties under the FHA.  Accordingly, Plaintiffs are entitled to declaratory relief.

77.     Unless enjoined, Defendants will continue to engage in the unlawful acts and pattern or practice of discrimination and coercion, intimidation, interference and retaliation described above.

### COUNT I

### (Violation of Fair Housing Act, 42 U.S.C §3604)

78.     Plaintiffs reallege paragraphs 1 through 77.

79.     By refusing and failing to repair and remediate the defects in the Condominium common elements, and the substantial damage caused thereby to the interior of Plaintiffs' unit, Defendants have "otherwise [made] unavailable or den[ied], a dwelling" to Plaintiffs on the basis of familial status in violation of 42 U.S.C. §3604(a).

80.     Defendant Council's decision to issue the January 19, 2010 Cease and Desist letter to Plaintiffs was made on an impermissible basis, i.e., to avoid the possibility of a discrimination claim being filed against them by Mr. Flynn on the basis of race, and had the effect of treating Plaintiffs differently and applying "different terms, conditions, or privileges," or providing different services or facilities in connection therewith, on the basis of race in violation of 42 U.S.C. §3604(b).

81.     By issuing Cease and Desist letters only to Plaintiffs and other families with children, Defendants have applied "different terms, conditions, or privileges," or provided different services and facilities in connection therewith, to Plaintiffs on the basis of familial status in violation of 42 U.S.C. §3604(b).

**COUNT II**

**(Violation of the Fair Housing Act, 42 U.S.C. §3617)**

82.     Plaintiffs reallege paragraphs 1 through 81.

83.     By repeatedly publishing, through multiple mediums, specific information relating to Plaintiffs' attempts to exercise their rights protected under the Fair Housing Act, Defendants have coerced, intimidated, threatened, interfered with, and retaliated against Plaintiffs in the exercise or

enjoyment, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted to them, or protected, by the Fair Housing Act, including, but necessarily limited to, threatening, intimidating, or interfering with the enjoyment of their home, in violation of 42 U.S.C. §3617.

84. By refusing and failing to repair and remediate the defects in the Condominium common elements, and the substantial damage caused thereby to the interior of Plaintiffs' unit, Defendants have coerced, intimidated, threatened, interfered with, and retaliated against Plaintiffs in the exercise or enjoyment, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted to them, or protected, by the Fair Housing Act, including, but necessarily limited to, threatening, intimidating, or interfering with the enjoyment of their home, in violation of 42 U.S.C. §3617.

85. When Defendants issued the May 10, 2011 Cease and Desist letter, Defendants coerced, intimidated, threatened, interfered with, and retaliated against Plaintiffs in the exercise or enjoyment, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted to them, or protected, by the Fair Housing Act, including, but necessarily limited to, threatening, intimidating, or interfering with the enjoyment of their home, in violation of 42 U.S.C. §3617.

86. By implementing a policy that prohibits only certain identified classes of people from attending Board of Directors or Council meetings on behalf of Plaintiffs, Defendants have coerced, intimidated, threatened, interfered with, and retaliated against Plaintiffs in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted to them, or protected, by the Fair Housing Act,

including, but necessarily limited to, threatening, intimidating, or interfering with the enjoyment of their home, in violation of 42 U.S.C. §3617.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Declare that the actions of the Defendants complained of herein are in violation of the Fair Housing Act, as amended, 42 U.S.C. §§3604(a), (b) and 3617;

(b) Enjoin all unlawful practices complained of herein and order Defendants, their agents, representatives, employees, successors and assigns and all persons acting in concert or participating with them, to take appropriate affirmative action to ensure that the activities and practices complained of above are not engaged in again;

(c) Impose affirmative injunctive relief requiring Defendants to take any and all necessary steps to repair and remediate all defects in the Condominium common elements that have caused substantial damage to Plaintiffs' unit and rendered it uninhabitable, and to restore Plaintiffs' unit to its original condition;

(d) Award each Plaintiff appropriate compensatory damages;

(e) Award punitive damages against Defendants in favor of the Plaintiffs;

(f) Award Plaintiffs their costs and expenses of this action, including reasonable attorneys' fees; and

(g) Award Plaintiffs any other relief that is proper.

Respectfully submitted,

**BRENNAN McCARTHY & ASSOCIATES**
1116 West Street, Suite C
Annapolis, Maryland 21401
Tel:  (443) 294-1083
Fax:  (443) 200-6135
bmccarthy@brennanmccarthy.com


By:  _____/s/_____
        Brennan C. McCarthy, Esquire
        *Federal Bar No.: 26518*

**COAN & LYONS**
1100 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20036
Tel:  (202) 728-1070
Fax:  (202) 293-2448
ssalmon@coanlyons.com
ccoan@coanlyons.com


By:  _____/s/_____
        Sheila C. Salmon, Esquire
        *Pro Hac Vice* Pending



By:  _____/s/_____
        Carl A. S. Coan, III, Esquire
        *Pro Hac Vice* Pending


Dated: October 3, 2014                    *Counsel for Plaintiffs*