**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                                    |        |                        |
|------------------------------------|--------|------------------------|
|                                    | *      |                        |
| PAUL C. CLARK, *et. al*            | *      |                        |
|                                    | *      |                        |
| v.                                 | *      | Civil No. JFM-14-3122  |
|                                    | *      |                        |
| 100 HARBORVIEW DRIVE COUNCIL OF    | *      |                        |
| UNIT OWNERS d/b/a 100 HARBORVIEW   | *      |                        |
| CONDOMINIUM ASSOCIATION, *et. al*  | *      |                        |
|                                    | ****** |                        |

## MEMORANDUM

Plaintiffs Paul C. Clark, Rebecca Delorme, and Paul C. Clark, Jr. bring suit against

defendants 100 Harborview Drive Council of Unit Owners ("Harborview"), Zalco Realty, and

John H. Cochran seeking damages, declaratory relief, and injunctive relief for violations of the

Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq*. Now pending is defendant John H.

Cochran's motion for summary judgment. The parties have fully briefed the motion for

summary judgment, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons

below, the motion for summary judgment is granted.[1]

## BACKGROUND

This is the latest-filed action in a quintet of cases, and numerous administrative actions

relating to a series of disputes between plaintiffs, who purchased a penthouse condominium in

---

[1] Defendant Harborview has also filed a notice of automatic stay for bankruptcy pursuant to 11 U.S.C. § 362(a). (ECF No. 71). Plaintiffs suggest the case be stayed with respect to all defendants. (ECF No. 70). But because the bankruptcy court has not stayed the case with respect to Cochran, and Cochran's motion for summary judgment was filed more than eight months ago, I decide Cochran's motion, stay the case with respect to the remaining two defendants—Harborview and Zalco—and administratively close the case without prejudice to the right of plaintiffs to move to reopen this action for good cause shown.

the Harborview Towers, and defendants, who manage or managed Harborview.[2]  The genesis of

what one court has described as a "multiplex of administrative and trial court actions and

appeals," *100 Harborview Drive Condo. Council of Unit Owners v. Clark*, 119 A.3d 87, 93 (Md.

App. 2015), is November 2009, when plaintiffs Paul Clark and Rebecca Delorme, along with

their 5-year-old, Paul Clark, Jr., moved into their Harborview condominium.  Shortly after the

move, the Harborview Council of Unit Owners, of which defendant Cochran was a member,

started receiving complaints regarding noise from the plaintiffs' condominium unit from their

downstairs neighbors, the Flynns.  (*See, e.g.*, ECF No. 67, Ex. 4).  Harborview attempted to

resolve the complaints by dispatching its general manager, Gisele Rivera, to make phone calls

asking plaintiffs to reduce their noise.  (ECF No. 44, Ex. C, p. 2).[3]  Despite Rivera's efforts,

Flynn's complaints to Harborview continued,[4] and after some internal deliberation amongst the

Council,[5] on January 19, 2010, Harborview issued a cease and desist letter alleging that Clark

Jr.'s "running, jumping, yelling, pounding on the floor, screaming and crying" violated sections

of Harborview's bylaws prohibiting nuisances and excessive noise.  (ECF No. 67, Ex. 12).  The

letter formally demanded plaintiffs cease and desist making noise "which violates the Council's

---

[2] Defendant John Cochran, whose summary judgment motion is pending, was elected to a two-year term on the volunteer Council of Unit Owners at Harborview in 2008, and was elected President of the Council in 2010.  In 2014, after serving as a Council Member for six years, and President for four of those years, Cochran ended his tenure on the Council.  (*See* ECF No. 44, Ex. B).

[3] All references to Cochran's summary judgment motion reflect his substitution of exhibits. (ECF No. 45).

[4] The Flynns went so far as to commission a noise study from a professional acoustics engineering firm.  The firm noted that, "Airborne sound from the unit above, such as loud yelling, screaming, and crying, are . . . audible in [the Flynns'] unit.  In our thirty years of experience, such noise levels, as described in this report are abnormally high . . . ." (ECF No. 44, Ex. C, p. 5).

[5] One board member hypothesized that the problem was not the amount of noise Clark Jr. was making, but rather "the sound attenuation between the ceiling and the floor," which was caused by the "building design between the ceiling and the floor."  (ECF No. 67, Ex. 5, p. 3).

governing documents and that [causes] a nuisance and inter[ference] with the Flynns' right to quiet and peaceful enjoyment of their home." *Id.*

Plaintiffs responded almost immediately by filing a complaint with the U.S. Department of Housing and Urban Development ("HUD") alleging that by issuing the cease and desist letter, Harborview had discriminated against them on the basis of their familial status. (ECF No. 1, ¶ 28). HUD referred the complaint to the Maryland Commission on Human Relations, which, later that year in August, made a finding of no probable cause. (ECF No. 44, Ex. C., p. 6–7).

Approximately three months after plaintiffs filed their HUD complaint, and shortly after Cochran was promoted from Council Secretary to Council President, Harborview began including a "Litigation Update" section in *Tower Topics*, Harborview's monthly newsletter, which was distributed to residents, realtors, and real estate brokers, and posted on Harborview's website. (*See* ECF No. 67, Ex. 15, pp. 2–3). The Litigation Update section included descriptions of cases, the status of insurance coverage for those cases, and the disposition of cases. *See id;* (*see also* ECF No. 67, Ex. 14, p. 2).

While the first HUD action was ongoing, plaintiffs discovered mold in their unit. This discovery led them to hire a mold testing service and after that service determined the air quality in the unit was at a dangerous level, plaintiffs moved out of their home and into a unit at a neighboring condominium building. (*See* ECF No. 44, Ex. E, p. 6). At the same time, defendants Zalco and Harborview contracted with a mold remediation company to begin mitigation and remediation work in the condominium. *See id.* Harborview and Zalco also contracted with two companies to fix the structural problems causing the mold. *See id.* at 8. Plaintiffs, however, grew unsatisfied with the quality of the work done, and padlocked their unit,

preventing the mold remediation company from completing their work.[6]  *See id.* at 8.  Since then, plaintiffs have restricted access to the unit to times when they are available to unlock it.  *See id.* at 8–9.

In May 2011, while Delorme and Clark Jr., still living in a rental unit, were visiting friends at Harborview, Harborview staff reported seeing Clark Jr. in the swimming pool when the pool was closed in violation of Harborview's bylaws.  *Id.* at 7.  As a result, Harborview sent Delorme a letter demanding she cease and desist using the pool when it was closed.  (*See* ECF No. 44, Ex. M).

Further displeased, plaintiffs filed another HUD complaint against defendants in September 2011.[7]  In that complaint, Clark and Delorme alleged that defendants Zalco and Harborview "discriminated against them based on their familial status, made discriminatory statements, and retaliated against them for exercising their fair housing rights."  (ECF No. 44, Ex. E, p. 3).  Specifically, Clark and Delorme alleged that: (1) defendants failed to fix leaks and remediate mold in their unit; (2) defendants issued a cease and desist letter falsely accusing them of allowing Clark Jr. to swim in the Harborview pool when it was closed; (3) defendants retaliated against them by "posting public notifications and updates regarding" their complaints; (4) defendants tracked their "comings and goings;" and  (5) defendants issued an erroenous lien

---

[6] These events led plaintiff Clark to file the first of his five lawsuits (*Clark I*), in which Clark alleged that Harborview and Zalco had deceived him by issuing false and misleading Resale Disclosure Certificates.  Baltimore City Circuit Court dismissed *Clark I* at the summary judgment stage.  *See 100 Harborview Drive Condo. Council of Unit Owners v. Clark*, 119 A.3d 87, 94–95 (Md. App. 2015) (describing the action).

[7] This was not plaintiffs' first brush with Harborview in the interim period between the dismissal of Clark's first HUD complaint and the filing of his second complaint.  During that time, Clark asserted three complaints with the Baltimore City Health Department, one complaint with the Maryland Office of the Attorney General, and one complaint in Baltimore City Circuit Court against Harborview.  *See 100 Harborview Drive,* 119 A.3d at 94–95; (*see also* ECF No. 44, Ex. E, pp. 4–5).  None of these actions, however, resulted in a finding of liability against Harborview.

notice as retaliation for plaintiffs' exercise of their FHA rights.  (ECF No. 44, Ex. E, p. 1).  HUD found that for each allegation, there was no reasonable cause to believe defendants retaliated or discriminated against plaintiffs, and dismissed the complaint.  (ECF No. 44, Ex. E, p. 1).

Not to be deterred, from January 2013 to March 2014, plaintiff Clark filed another three lawsuits against Harborview in Baltimore City Circuit Court.  In the first, Clark sought information from Harborview regarding his claims, Harborview's financial status, and the billing statements of Harborview's lawyers.  After review by the Maryland Court of Special Appeals, only one of Clark's demands was granted—Clark gained access "to inspect and copy legal invoices and billing records concerning Dr. Clark, his family, and [his condominium]." *100 Harborview Drive Condo. Council of Unit Owners v. Clark*, 119 A.3d 87, 93 (Md. App. 2015).  In Clark's second complaint, Clark asserted claims for breach of contract, negligence, specific performance, and breach of fiduciary duty against Harborview, and filed a petition for an order of arbitration and stay of action.  The Baltimore City Circuit Court granted his petition, and the Maryland Court of Special Appeals affirmed the decision.  *See id.* at 95.  In Clark's third complaint, he sought a temporary restraining order and injunctive relief allowing him to send his lawyers to Harborview board and committee meetings.  The Baltimore City Circuit Court ruled in favor of Harborview at the summary judgment stage.  (ECF No. 44, Ex. F).

On October 3, 2014, Clark filed a complaint, his fifth total, in this Court against defendants Harborview, Zalco, and Cochran alleging unlawful discrimination and retaliation under the FHA.  Currently pending is defendant Cochran's motion for summary judgment.  (ECF No. 44).

## STANDARD

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, when reviewing a motion for summary judgment, the court must look at facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

While the moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact, trial courts have an obligation to prevent "factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323–24). Therefore, in response to a properly supported motion for summary judgment, the non-moving party must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248–49; *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should also enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

**ANALYSIS**

Plaintiffs assert two FHA claims against defendant Cochran: first that Cochran discriminated against them on the basis of race and familial status; and second, that Cochran retaliated against them for exercising protected FHA rights.  I consider each claim in turn.

## I.        FHA Disparate-Treatment Discrimination Claim

Plaintiffs allege that Cochran impermissibly discriminated against them by issuing two cease and desist letters—one demanding a reduction in noise, and another demanding plaintiffs not use the Harborview pool when it was closed—and by failing to repair and remediate the defects in Harborview's common elements causing mold and other damage to plaintiffs' condominium.  For his part, Cochran contends that plaintiffs have not identified a genuine dispute of material fact showing that he acted with discriminatory animus, and that he was not responsible for any of plaintiffs' alleged harms.  Additionally, as to plaintiffs' last claim—Cochran's alleged failure to remediate—Cochran argues that it is barred by *res judicata*.  I agree with Cochran and grant summary judgment with respect to Count I of plaintiffs' complaint.

### i.     *Legal Standard*

The FHA prohibits property owners from "mak[ing] unavailable or deny[ing], a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a).  Likewise, the FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).  To establish an FHA disparate-treatment discrimination claim like the one plaintiffs advance here, a "plaintiff must establish that the defendant had a discriminatory intent or motive."  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (internal quotation marks omitted).  A plaintiff may proffer either direct or

indirect evidence of discriminatory intent, or make a showing of discrimination through the inferential *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework. *See Martin v. Brondum*, 535 F. App'x 242, 244 (4th Cir. 2013).

Direct or indirect evidence of discriminatory intent includes "conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested . . . decision." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (internal quotation marks omitted).  Put another way, direct or indirect evidence "is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010) (internal quotation marks omitted).

If plaintiffs cannot cite direct or indirect evidence of discriminatory intent, they may then rely on the three-part *McDonnell Douglas* burden-shifting framework, wherein plaintiffs must first proffer a prima facie case of discrimination; if plaintiffs are successful, the burden of production shifts to defendants, who must proffer a legitimate, non-discriminatory rationale for their action.  *See Antonio v. Sec. Servs. of Am., LLC*, 701 F. Supp. 2d 749, 781 (D. Md. 2010). Finally, after that rationale is proffered, the burden shifts again to plaintiffs who must prove by a preponderance of evidence that the defendants' rationale is merely pretext for discrimination. *See id.*

    *ii.*    *January 19, 2010 Cease and Desist Letter*

Plaintiffs allege that Cochran, who is white, and a grandparent, discriminated against them on the basis of race and familial status by participating in the issuance of the January 19,

2010 letter demanding plaintiffs cease and desist making "excessive noise."[8]  (ECF No. 44, Ex. K).  Plaintiffs, however, have not established a genuine dispute of material fact that Cochran discriminated against them.

### a.  Direct or Indirect Evidence

First, there is no direct or indirect evidence that Cochran participated in the issuance of the January 2010 cease and desist letter because of his racial animus.  Plaintiffs argue that because the Flynns, their downstairs neighbors, were black, and they were white, Cochran inappropriately used race as a consideration in encouraging Harborview to send plaintiffs a cease and desist letter.  As evidence, plaintiffs allege that in another instance, Harborview did not send a cease and desist letter to a black resident when the black resident's white neighbor, Nick Moore, complained about noise.

Plaintiffs contentions are unsupported.  In the entire record, plaintiffs can point to Cochran mentioning race only once before Harborview issued the January 2010 cease and desist letter.  And that mention weakens, rather than strengthens plaintiffs' claim—in an email discussing the Flynns' complaints, Cochran characterizes plaintiffs' and the Flynns' race as "irrelevant and immaterial." (*See* ECF No. 67, Ex. 5).

Further, there is no indirect or circumstantial evidence showing Cochran harbored discriminatory racial animus.  The discrepancy between Harborview's treatment of plaintiffs and Moore's black neighbor is explainable from the undisputed facts.  Before issuing the January 2010 cease and desist letter, Harborview attempted to schedule a hearing between the Flynns and plaintiffs where the two parties could mediate their claims.  (*See* ECF No. 67, Ex. 9, p. 2; Ex. 11, pp. 1–2).  However, instead of agreeing to the hearing, plaintiff Delorme rejected the overture,

---

[8] At this point, Cochran was not yet President of the Council.

arguing that Harborview's attempt to schedule a hearing was premature, and that Harborview was first required to send a cease and desist letter "specifying the alleged violation, action required to abate the violation and time period to provide remedy."  (ECF No.  67, Ex. 10).  In accordance with Delorme's demands, Harborview sent the January 2010 letter.  In contrast, Nick Moore's neighbor and Moore appeared to be amenable to mediation, and attended a hearing together.  Neither Moore nor his neighbor demanded Harborview issue a cease and desist letter before a hearing took place.  (*See* ECF No. 67, Exs. 38, 40).  Accordingly, the two cases are inapposite—plaintiff Delorme's demand for a cease and desist letter, and not any invidious race-based discrimination on the part of Cochran, explains Moore's neighbor's and plaintiffs' differential treatment.

Plaintiffs also fail to proffer direct or indirect evidence showing Cochran discriminated against plaintiffs on the basis of their familial status.  Plaintiffs attempt to paint several quotes— from a lengthy email Cochran sent to fellow Harborview councilmembers—as evidence of his discriminatory animus towards children.  They are, in relevant part, as follows:

- After a fellow councilmember's comment that Clark Jr. "isn't doing anything that normal kids don't already do," Cochran's response that "[i]n a single family home, no one is impacted by the noise [Clark Jr.] makes except those living in the home.  I think highrise condo living presents an entirely different situation."  (ECF No. 67, Ex. 5, p. 1).
- Cochran asking, "Would I want a kids' playground above my unit?" and stating that "[w]hen an owner buys a unit for $3.25 million and there is peaceful, quiet solitude to be enjoyed in that unit, I think it is entirely appropriate for that owner to complain when that solitude turns into a romper room."  *Id.*
- Cochran noting that Harborview's building manager "told me earlier this month that she visited the Flynn unit and heard noise she says is typical of noise of youngsters playing. That tells me that [plaintiffs'] unit is now a romper room."  *Id.* at p. 2.

None of Cochran's statements, however, can bear the weight plaintiffs place on them— these statements simply do not show that Cochran had a discriminatory attitude against children.

And even if I assume these statements demonstrate that Cochran had such an attitude, plaintiffs cannot show a causal link between Cochran's alleged discriminatory attitude and the issuance of the cease and desist letter.  The same email shows that, whatever animus Cochran bore towards children, it did not distract from his focus on what he believed to be the issue at hand, which was whether the noise from plaintiffs' unit constituted a nuisance.  For instance, Cochran mentioned that comments about whether the Flynns like children were "irrelevant and immaterial," and distracted from the primary question "of whether the quiet, peaceful enjoyment of one's home is being disturbed."  (ECF No. 67, Ex. 5, p. 1).  Similarly, in another paragraph, Cochran emphasized that who was making the noise was inconsequential to what he believed the true issue to be, which was "whether the noise is unreasonable."  (*See* ECF No. 67, Ex. 5, p. 2).  Thus, even assuming the email proves Cochran's discriminatory attitude, which is doubtful, it does not demonstrate that that attitude animated his participation in the issuance of the cease and desist letter.

Plaintiffs also cite two other Cochran statements as evidence.  In one email, in response to a councilmember stating, "we have to expect a certain amount of 5yo noise," Cochran says that the "[n]ext thing we hear will be the need for children's playground equipment in the building."  (ECF No. 67, Ex. 30).  In another, Cochran states, "[i]f we wanted, we could issue a cease and desist letter which would tell the Clarks that they must stop allowing the child to run without padded sole shoes such as Nike makes."  (ECF No. 67, Ex. 9).  Again, each statement, taken in the light most favorable to plaintiffs, fails to show Cochran possessed discriminatory animus towards families, and that such animus motivated his decision-making.[9]  *See Rhoads v.*

---

[9] Plaintiffs also contend that Cochran's objection to another councilmember's draft letter to Flynn—stating there was "no adequate evidence" of noise violations from plaintiffs' unit—constitutes evidence of discrimination.  (ECF No. 67, Ex. 31).  Plaintiffs' argument is unavailing.

*F.D.I.C.*, 257 F.3d 373, 391–92 (4th Cir. 2001) ("What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested . . . decision") (internal quotation marks omitted).

In conclusion, plaintiffs fail to proffer direct or indirect evidence of Cochran's discrimination on racial or familial status grounds.

### b. *McDonnell Douglas*

Although they fail to show direct or indirect evidence of Cochran's alleged discrimination with respect to the January 2010 cease and desist letter, plaintiffs can still meet their burden by relying on the *McDonnell Douglas* framework.  To meet their initial burden, and plead a prima facie case, plaintiffs must show they are members of "a protected class and that [they were] treated differently than other tenants because of [their] membership in that class." *Roberson v. Graziano*, No. 09-3038, 2010 WL 2106466, at *2 (D. Md. May 21, 2010) *aff'd*, 411 F. App'x 583 (4th Cir. 2011).   Plaintiffs can meet the second requirement by either "raising an inference" that Cochran discriminated against them, *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998), or showing that Harborview residents outside of their protected class, *i.e.*, "comparators," were similarly situated but received more favorable treatment.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated [persons] were not treated equally.").

Plaintiffs carry their initial burden for their familial status discrimination claim by citing the aforementioned record evidence of Cochran discussing familial status.  I find that their evidence is at least sufficient to create an inference that Cochran discriminated against them.  Plaintiffs also carry their initial burden for their race discrimination claim by showing that, with

---

Cochran objected to the draft letter because there had not been a complete investigation of the Flynns' claims; obviously, this is not evidence of discrimination.

respect to issuance of cease and desist letters related to noise complaints, Cochran treated

Moore's neighbor differently.  Because plaintiffs have adequately pled a prima facie case on

their race and familial discrimination claim, the burden shifts to Cochran to proffer a legitimate,

nondiscriminatory reason for plaintiffs' differential treatment.  Cochran carries this burden by

proffering two legitimate, nondiscriminatory reasons.  First, as explained above, the reason

Harborview sent plaintiffs a cease and desist letter and did not send one to Nick Moore's

neighbor, is clear from the undisputed facts: plaintiff Delorme demanded a cease and desist letter

before scheduling a mediation hearing, Moore, on the other hand, did not.  Second, another

reason Cochran sets forth for his participation in the issuance of the cease and desist letter was

that he believed that plaintiffs were actually causing a nuisance with the noise they were making.

In response to Cochran's proffered rationales, plaintiffs, who, throughout the case, carry

the ultimate burden of showing defendant intentionally discriminated against them, must show

that Cochran's proffered reason was pretext for race and familial status discrimination.  This

plaintiffs cannot do.  First, as discussed in Part I.ii.a, the record evidence does not show that

Cochran harbored any racial animus toward plaintiffs.  Second, the undisputed facts demonstrate

that Cochran's proffered reasons for sending the letter were not pretext.  Cochran and

Harborview attempted to set up a mediation hearing in both plaintiffs' and Moore's neighbor's

case.  In response to defendants' efforts to resolve the situation amicably, plaintiffs demanded

Harborview send them a cease and desist letter, but Moore's neighbor did not.  Therefore,

plaintiffs' demand explains why Harborview sent them, but not Moore's neighbor, a cease and

desist letter.  Plaintiffs provide no persuasive evidence defeating this neutral, nondiscriminatory

rationale.  The evidence also shows that Cochran's second proffered reason for his actions—that

plaintiffs' noise was causing a nuisance—does not appear to be pretext.  In encouraging

Harborview to send the cease and desist letter, Cochran emphasized that the primary issue in determining whether to send the letter was "whether the noise is unreasonable," and not any illegitimate considerations.  (ECF No. 67, Ex. 5, p. 2).  Moreover, Cochran appears to have sent the letter on the basis of reliable evidence showing that the plaintiffs were, in fact, making excessive noise.  (*See, e.g.*, *id.* (describing a resident's observation of noise from plaintiffs' unit); ECF No. 44, Ex. C, p. 5 (showing that the Flynns had presented a noise study to Harborview and Cochran describing the noise coming from plaintiffs' unit as "abnormally high"); ECF No. 67, Ex. 12 (noting that the Harborview General Manager, a member of Harborview's Maintenance Committee, and the Board President had visited the Flynns and heard noise from plaintiffs' unit)).  Accordingly, given that Cochran's proffered rationales were not pretext, no reasonable factfinder could conclude that Cochran participated in Harborview's decision to send plaintiffs the January 2010 cease and desist letter because of their race or familial status.

      iii.      *May 11, 2011 Cease and Desist Letter and Cease and Desist Letters from 2009–11*

Plaintiffs also allege that Cochran unlawfully discriminated against them on the basis of familial status by participating in the issuance of a second cease and desist letter, this time related to Delorme's and Clark Jr.'s use of Harborview's pool when the pool was closed. Plaintiffs also contend, more broadly, that from 2009–2011, Harborview only issued cease and desist letters to families with children and that this constitutes discrimination on the basis of familial status.  (ECF No. 1, ¶ 80).   Plaintiffs, however, again fail to proffer evidence of Cochran's discriminatory animus, and how such animus motivated his participation in the issuance of plaintiffs' cease and desist letters.  Therefore, plaintiffs fail to establish a genuine issue of material fact.

      **a.  Direct or Indirect Evidence**

Plaintiffs do not cite any evidence not already discussed in the record of Cochran mentioning race or familial status in connection with the issuance of the May 2011 letter or any other letters.[10]  Self-evidently then, there is no direct or indirect evidence of discrimination.

### b. *McDonnell Douglas*

Plaintiffs fail to carry their initial burden under the *McDonnell Douglas* framework. While the burden for pleading a prima facie case is low, *see, e.g.*, *Parker v. N. Carolina Dep't of Agric., Food & Drug Div.*, 39 F.3d 1178 (4th Cir. 1994), plaintiffs must still sufficiently prove each element so that a reasonable fact-finder could conclude "that in the absence of any further explanation," plaintiffs were victims of discrimination.  *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993) *modified on other grounds by Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420 (4th Cir. 2000).  Plaintiffs fail to direct this court to any substantial evidence creating the inference that Cochran discriminated against them in the issuance of the May 2011 letter.  Accordingly, plaintiffs' prima facie case rests entirely on whether similarly situated comparators outside plaintiffs' protected class were treated differently.  *See Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).  With respect to the May 2011 letter, plaintiffs contend that cease and desist letters related to the pool incident were only issued to them and the family they were visiting, and not young adults at a party nearby, accordingly, they argue, issuance of the May 2011 letter constituted discriminatory enforcement of Harborview's rules.  (ECF No. 67, pp. 20–21).  Plaintiffs also contend that, as a general matter, from 2009–2011, Harborview only

---

[10] In an email unrelated to the pool incident, and after issuance of the first cease and desist letter, Cochran discusses the handling of plaintiffs' first HUD complaint.  Cochran states, somewhat inartfully, that "it won't be long before Flynn's claim of discrimination reaches the United States District Court in Baltimore.  This Board is lily white, our lawyers are lily white, the Clarks are lily white and guess who ain't." (see ECF No. 67, Ex. 27).  This, however, falls far short of establishing that Cochran had discriminatory animus against plaintiffs due to their race and treated them differently on that basis.

issued cease and desist letters to families with children and that this constitutes discrimination on the basis of familial status.  (ECF No. 1, ¶ 80).  Both claims fail.

For their first argument, plaintiffs rely exclusively on a letter from their friend, in which the friend, relaying hearsay from plaintiff Delorme, states that Clark Jr. was not swimming in the pool and that partiers nearby were dropping and breaking bottles on the pool floor without any repercussions from Harborview.  (ECF No. 67, Ex. 33).  Neither plaintiffs' friend nor plaintiffs, however, mention the familial statuses of the partiers; accordingly, plaintiffs cannot plead a prima facie case because they cannot show the partiers were outside their protected class, and that Cochran treated plaintiffs differently than residents outside plaintiffs' protected class.

Plaintiffs' second argument—that Harborview discriminated against families because it only issued cease and desist letters to families with children from 2009–2011—fails because plaintiffs provide no more context.  *See Shea v. Kerry*, 961 F. Supp. 2d 17, 49 (D.D.C. 2013) (in a discrimination case, "numbers are irrelevant without some explanation of their significance") *aff'd*, 796 F.3d 42 (D.C. Cir. 2015); *cf. Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994) ("[I]f a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence.").  Specifically, plaintiffs fail to show that single individuals, married couples with no children, or married couples with children that were not living with them violated condominium safety rules, but were not subject to enforcement of those rules.  Further, plaintiffs fail to state how many cease and desist letters were issued from 2009–2011, and thus, there is no indication that plaintiffs' allegation is statistically significant or probative.  *See Collier v. Serv. Am. Corp.*, 934 F. Supp. 168, 173 (D. Md. 1996) (holding that a statistic is deficient when it "is not only too small to be statistically significant," but also does not speak to the characteristics of comparators).  Accordingly, because

the solitary fact that Harborview only issued cease and desist letters to families with children

from 2009–2011, without further explanation, is insufficient to establish that plaintiffs were

treated differently than other tenants due to their protected status, plaintiffs' evidence falls below

the threshold necessary to establish a prima facie case of discrimination.[11]  *See Lightner v. City*

*of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) (holding that plaintiffs' prima facie case

failed because she had not established the meaningfulness of "[t]he similarity between

comparators"); *Haywood v. Locke*, 387 F. App'x 355, 360 (4th Cir. 2010).

    *iv.*    *Damage to Plaintiffs' Condominium*

Plaintiffs' last claim alleges that by "refusing and failing to repair and remediate the

defects in [Harborview's] common elements, and the substantial damage caused . . . to the

interior of Plaintiffs' unit," Cochran denied plaintiffs' housing in violation of 42 U.S.C. §

3604(a).  (ECF No. 1, ¶ 79).  Cochran attacks this allegation on two fronts: one, he argues that,

as a result of a prior state suit (known as *Clark I*), the claim is barred by *res judicata*; two, he

argues that there is no genuine issue of material fact suggesting that Cochran is responsible for

damage to plaintiffs' unit.  I agree with Cochran on the first front, and find it unnecessary to

reach the second.

The doctrine of *res judicata* encompasses two concepts: claim preclusion and issue

preclusion; here, Cochran avers that plaintiffs' claim is barred by claim preclusion as a result of

Clark's earlier litigation in *Clark I*, an earlier state action wherein plaintiff Clark sued

Harborview and Zalco.  In determining the preclusive effect of prior Maryland state court suits,

this Court applies Maryland law.  *See Hall v. St. Mary's Seminary & Univ.*, 608 F. Supp. 2d 679,

684 (D. Md. 2009).  The elements of claim preclusion or *res judicata* under Maryland state law

---

[11] I note that this holding finds accord in HUD's determination in Clark's second HUD case. (*See* ECF No. 44, Ex. E, pp. 11–12).

are: "(1) that the parties in the present litigation are the same or in privity with the parties to the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and, (3) that there has been a final judgment on the merits." *Grimes v. Miller*, 448 F. Supp. 2d 664, 668 (D. Md. 2006).

### a. Privity

First, the parties dispute whether the parties in the instant action are in privity with those in *Clark I*. The parties agree that Cochran was not a party in *Clark I*, but disagree as to whether Cochran was a privy to defendant Harborview, who was a party. Plaintiffs also contend that because only Clark sued in the state action, plaintiffs Delorme and Clark Jr. were not privies to those actions. Plaintiffs' arguments are without merit.

In Maryland, privity is determined by a functionalist test—those who "have a direct interest in the suit . . . [or] are so far represented by another that their interests receive actual and efficient protection" are privies. *Cochran v. Griffith Energy Servs., Inc.*, 43 A.3d 999, 1003 (Md. 2012). As a result, "Maryland recognizes that a principal and his agent are in privity." *Kutzik v. Young*, 730 F.2d 149, 152 (4th Cir. 1984); *see also deLeon v. Slear*, 616 A.2d 380, 389 (Md. 1992) (holding that an employee was in privity with her employer). Here, as even plaintiffs admit, Cochran is Harborview's agent (*see* ECF No. 67, pp. 32–34), and it follows then that Cochran is a privy to the defendants in Clark's earlier suits. With regard to the question of whether plaintiffs Delorme and Clark Jr. are privies, in *Cochran*, the Maryland Court of Appeals ruled that plaintiff children were in privity with their parents because their interests "were adequately represented by" their parents in the first lawsuit. Here, too, plaintiffs Delorme and Clark Jr.—whose interests Clark represented in the previous actions by virtue of the fact that plaintiffs all live together and form a family—are in privity with Clark. As such, because

Cochran, Delorme, and Clark Jr. are privies to the prior state actions, the first prong of the *res judicata* standard is met.

### b.    Identical claim

In determining whether the successive action presents an identical claim to those already litigated, Maryland has adopted the transactional test, which requires claims "based upon the same set of facts," and which would ordinarily be tried together, to be asserted in the same suit. *Anne Arundel Cty. Bd. of Educ. v. Norville*, 887 A.2d 1029, 1038 (Md. 2005).  That is, "[a]ll matters which were litigated or *could* have been litigated in the earlier case are conclusive in the subsequent proceeding."  *Id.* (internal quotation marks omitted).

I find that the claim here is identical to the one presented in plaintiff Clark's first litigation against Harborview, *Clark I*.  In that case, *Paul C. Clark v. Zalco Realty, Inc., et. al*, Balt. City Cir. Ct. No. 24 -C-10-007236, Clark filed a second amended complaint on January 2012, nearly two years after plaintiffs moved out of their condominium due to mold damage. (*See* ECF No. 44, Ex. P).  In the complaint, he alleged a nearly identical set of facts to the facts he alleges here.  Specifically, he pled that Harborview had "been plagued for years by substantial water infiltration and mold infestation problems caused by leaks in the exterior façade and roof system" (*id.* at ¶ 17); that "water damage to common elements of the condominium building" had subjected plaintiffs' property to "dangerous mold" (*id.* at ¶ 30); that a mold testing service advised plaintiffs "the Property was unsafe to inhabit," forcing plaintiffs "to move from the Property" (*id.* at ¶ 31); that plaintiffs have been unable to return (*id.*); and that attempts to compel Harborview and Zalco to repair and remediate the condominium had been "futile" (*id.* at ¶ 32).  (*See also id.* at ¶ 33).  These allegations are nearly identical to those set forth in ¶¶ 43–46 of plaintiffs' complaint in the instant case (ECF No. 1), which form the basis for plaintiffs'

failure to repair and remediate claim.  Accordingly, because plaintiffs plead the same facts as

they did in *Clark I*, and could have litigated their FHA claims in *Clark I*,[12] I find the claims

identical.  *See Hall v. St. Mary's Seminary & Univ.*, 608 F. Supp. 2d 679, 686 (D. Md. 2009)

("Two suits that rely upon the same facts will share an identity of claims even if the suits are

based upon different legal theories.").

### c.   Final Judgment on the Merits

Lastly, as is undisputed, the Baltimore City Circuit Court granted summary judgment to

defendants in *Clark I*, which the Maryland Court of Special Appeals affirmed on appeal.

Accordingly, there has been a final judgment on the merits, and all three elements of *res judicata*

are met.  Plaintiffs' repair and remediation claim is dismissed on the basis of *res judicata*.[13]

\*        \*        \*

Taken together, none of the direct or circumstantial evidence presented by plaintiffs

establishes that defendant Cochran has a discriminatory attitude, which motivated his

participation in the issuance plaintiffs' cease and desist letters.  Moreover, plaintiffs' repair and

---

[12] Plaintiffs argue that *res judicata* is inappropriate because plaintiffs have the right under the FHA to bring their action in federal court.  (ECF No. 67, pp. 45–46).  Be that as it may, because state jurisdiction over FHA cases is not preempted, and plaintiffs could assert their claim in state court, plaintiffs' right to bring an FHA claim in federal court is irrelevant to the *res judicata* determination.

[13] For the first time in their opposition to Cochran's motion for summary judgment, Plaintiffs allege that Cochran, "acting in his individual capacity, unilaterally placed holds on scheduled construction in Plaintiffs' unit that would have aided in the repair of the unit."  (ECF No. 67, p. 7).  But because plaintiffs did not properly plead such allegations in their complaint, I do not consider them.  *See Harris v. Reston Hosp. Ctr.*, LLC, 523 F. App'x 938, 946 (4th Cir. 2013) (holding that "constructive amendment of the complaint at summary judgment" constitutes "an impermissible attempt to . . . amend the complaint").  To the extent that plaintiffs properly allege a claim related to repair and remediation *after* Clark's second amended complaint in *Clark I*, (*see* ECF No. 1, ¶ 50) (describing a concern with pigeon feces and a continuing failure to remediate), they fail to proffer any evidence—besides an unreadable document (*see* ECF No. 67, Ex.19)— showing that Cochran played a role in the events underlying the claim, or that his purported discrimination precipitated those events.

remediation claim is barred by *res judicata*.  Accordingly, I grant Cochran's motion for summary judgment as it relates to Count I of plaintiffs' complaint.

## II.    FHA Retaliation Claim

Plaintiffs allege that Cochran unlawfully retaliated against them in violation of the FHA by publicizing plaintiffs' attempts to exercise their FHA rights, issuing the May 10, 2011 cease and desist letter, arranging for a police escort to accompany plaintiffs to their unit, and implementing a policy prohibiting plaintiffs' lawyers from attending Harborview meetings.[14]

### i.    Legal Standard

The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person" who exercises her rights under the FHA.  42 U.S.C. § 3617.  To state a claim for retaliation, plaintiffs must show that (1) they were engaged in protected activity; (2) Cochran was aware of the activity; (3) Cochran took adverse action against them; and (4) a causal connection existed between the protected activity and the adverse action.  *Hall v. Greystar Mgmt. Servs., L.P.*, No. 14-2145, 2016 WL 241377, at *4 (4th Cir. Jan. 21, 2016).

### ii.    Publicizing Plaintiffs' Actions

According to plaintiffs, Cochran, as President of Harborview's Council, started a "campaign of publicizing, often and broadly, information about Plaintiffs and their protected fair-housing related activity."  (ECF No. 67, p. 23).  Specifically, plaintiffs allege that Cochran began including a "Litigation Updates" section" in *Tower Topics*, a monthly Harborview newsletter (available throughout the building and online), that publicized plaintiffs' litigation, and that from April 2010–April 2012, updates on the plaintiffs' litigation actions were included in *Tower Topics* six times.  (ECF No. 1, ¶¶ 31–35; ECF No. 44, Ex. E, p. 10).  Moreover,

---

[14] Plaintiffs also allege retaliation based on Cochran's alleged failure to repair and remediate their condominium.  As I held *supra*, this claim is barred by *res judicata*.

plaintiffs allege that Cochran caused to be published information about plaintiffs' litigation

actions in several emails to Harborview residents, a newsletter called *Updates*, Harborview's

annual reports, and on Harborview's website.  (*See* ECF No. 1, ¶¶ 36–39)*.*  Plaintiffs also allege

that Cochran discussed their litigation actions at Harborview meetings.  (*See id.* at ¶ 30).

Given that plaintiffs filed a HUD complaint against Harborview, and Cochran knew of

the complaint, plaintiffs satisfy the first two requirements of a 42 U.S.C. § 3617 claim.  Cochran

avers, however, that he did not take an adverse action against plaintiffs by publicizing their

litigation actions to the Harborview community; and even if he did, it was not in retaliation for

their exercise of FHA rights.  I agree.

### a.   Publication of Plaintiffs' Actions

I find that plaintiffs have not shown a genuine dispute of material fact as to whether

Cochran retaliated against plaintiffs by publishing plaintiffs' actions for two reasons.  First,

Cochran did not commit an adverse action by publishing plaintiffs' actions in emails, *Tower

Topics*, *Updates*, Harborview's annual reports, and on Harborview's website.  And second, even

notwithstanding plaintiffs' failure to show an adverse action, Cochran did not retaliate against

plaintiffs for their exercise of their FHA rights.  To successfully plead a claim of retaliation,

plaintiffs must show defendants took adverse action against them, *i.e.*, that defendant interfered

with their rights or coerced, intimidated, or threatened them for having exercised those rights.

*See* 42 U.S.C. § 3617.  With regard to the adverse action requirement, the Seventh Circuit, sitting

en banc, noted that "[i]nterference is more than a quarrel among neighbors or an isolated act of

discrimination but rather is a pattern of harassment, invidiously motivated."  *Bloch v. Frischholz*,

587 F.3d 771, 783 (7th Cir. 2009) (internal quotation marks omitted).  No harassment, coercion,

intimidation, or threat, as a singular act or as a pattern, exists here.  The updates in *Tower Topics*,

and in the lone email plaintiffs proffer, were factual, and did not include any language that could be perceived as inflammatory or threatening.  (*See* ECF No. 67, Exs. 16–18).  Likewise, there is no allegation or evidence that the updates provided by Harborview in *Updates*, Harborview's annual reports, and on Harborview's website were coercive, threatening, or intimidating.[15]  No reasonable factfinder could find that the publicizing of plaintiffs' actions in these fora constituted adverse action; and thus, plaintiffs cannot fulfill the third requirement of an FHA retaliation claim.

Second, even assuming *arguendo* Cochran committed an adverse action, a reasonable factfinder could not draw the inference that by publicizing plaintiffs' litigation actions, Cochran retaliated against them for their exercise of FHA rights.  For instance, the *Tower Topics* updates were not just limited to plaintiffs' litigation; the Litigation Updates section also described other litigation actions not involving the FHA and not involving plaintiffs.  (*See* ECF No. 67, Exs. 15, 16) (describing two other actions against Harborview).  Moreover, Harborview's and Cochran's publication of plaintiffs' actions was justifiable.  All Harborview residents were responsible for common expenses arising out of both insurance costs for litigation, and litigation costs not covered by insurance.  (*See* ECF No. 67, Ex. 17, p. 2) (describing litigation costs for residents); *see also* ECF No. 44, Ex. J, Art. IX).  Accordingly, Harborview residents, the intended audience for these publications, had an interest in staying informed about the litigation actions pending against Harborview, and Cochran, who had a fiduciary duty to Harborview's residents, acted reasonably in keeping them abreast of plaintiffs' actions.  For these reasons, plaintiffs do not present a genuine issue of material fact with respect to whether Cochran, by participating in the

---

[15] Besides one email release, plaintiffs fail to provide context, or for that matter, evidence of Cochran's publication of their litigation in emails, *Updates*, Harborview's annual reports, and on Harborview's website.

publication of plaintiffs' litigation actions, retaliated against plaintiffs for their exercise of FHA rights.

### a. Publicizing Plaintiffs' Actions at Harborview Meetings

Similarly, plaintiffs fail to show that Cochran's discussion of plaintiffs' actions at Harborview meetings constituted retaliation.  Plaintiffs cite to only one instance in the record of Cochran allegedly harassing them at a meeting.  Plaintiff Delorme, in an email to her attorney, recounts a Harborview Community Association meeting where Cochran updated the audience, which included members of neighboring condominium associations, on plaintiffs' litigation. (*See* ECF No. 67, Ex. 43).  When other attendees questioned the relevance of Cochran's update, Delorme alleges that "Cochran bolted up from his chair across the table at me and furiously screamed (with spit flying): 'WELL TELL THEM TO QUIT FUCKING SUING US THEN.'" *Id.*  However scurrilous Delorme's allegations may be, because they are uncorroborated, unsworn,[16] and self-serving, they are insufficient to create a genuine dispute of material fact. *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").

---

[16] Plaintiff Delorme has not sworn, under penalty of perjury, to the above account.  Several weeks after filing their opposition to Cochran's motion for summary judgment, plaintiffs, including Delorme, filed affidavits affirming under penalty of perjury that the "facts alleged in Plaintiffs' . . . Opposition . . . are true and correct to the best of my personal knowledge, information, and belief." (*See* ECF No. 67, Ex. 52).  Even ignoring the fact that these affidavits appear to be untimely, (*see* ECF No. 70; Fed. R. Civ. P. 6(b)(1)),  nowhere in Delorme's affidavit is there any mention, or verification, of the exhibit communicating Delorme's account of events at the Harborview Community Association.  Accordingly, because Delorme did not substantially comply with the requirements of 28 U.S.C. § 1746, which prescribes a specific procedure for verifying an "unsworn declaration, certification, verification, or statement," I find that Delorme's allegations were unsworn, and thus, improperly asserted. *See Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 472 n.2 (D. Md. 2013) ("28 U.S.C. § 1746 states that a statement of verification must be in 'substantially' the same form as the statement set forth in § 1746(2), and there are two statements that are essential: (i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury") (internal quotation marks and alterations omitted).

###### iii.     *May 10, 2011 Cease and Desist Letter*

Plaintiffs allege that Cochran's role in issuing the May 10, 2011 cease and desist letter constituted retaliation for their exercise of FHA rights.  But plaintiffs' claim fails because they cannot show that the issuance of the letter was an adverse action or that a causal connection existed between the issuance of the letter and their protected activity.  The letter, which states that plaintiff Delorme must cease and desist violating condominium rules related to use of Harborview's swimming pool, was never enforced.  The issuance of the letter, without any further action, was not coercive, threatening, or intimidating; therefore, it was not an adverse action.  Moreover, plaintiffs have failed to show that the letter bears any relation to their exercise of FHA rights.  To that point, the record is bereft of any evidence, circumstantial or otherwise, showing the May 2011 letter and plaintiffs' exercise of FHA rights were related.  Further, as plaintiffs admit, Harborview issued a similar cease and desist letter on the same day to Delorme's friend, who was *not* exercising her FHA rights.  (*See* ECF No. 67, p. 20).  Accordingly, there is no genuine dispute of material fact that Cochran retaliated against plaintiffs by issuing the May 2011 cease and desist letter.

###### iv.     *Police Escort*

Plaintiffs also allege that Cochran retaliated against them by arranging for a police escort to accompany Delorme into their unit after plaintiffs moved out.  They acknowledge, however, that Cochran allowed Delorme to enter the unit alone, (*see* ECF No. 67, p. 7) and that Harborview's stated reason for offering to enlist the police escort was to accommodate Delorme's preference "that both management and building staff not be permitted into [her] unit."

(ECF No. 67, Ex. 20).  This allegation, which, at most, illustrates an inconvenience to plaintiffs, is not enough to show adverse action.[17]

> v.    *Policy Prohibiting Plaintiffs' Lawyers from Attending Harborview Meetings*

Lastly, plaintiffs aver that Cochran retaliated against them by participating in the enactment of a Harborview policy resolution barring plaintiffs' attorneys from attending Harborview meetings.  Because the subject matter of this claim was previously litigated in *Clark IV*, it is barred by *res judicata*.  In that case, *Paul C. Clark v. 100 Harborview Drive Council of Unit Owners*, Balt. City Cir. Ct. No. 24 -C-10-007236, plaintiff Clark sued Harborview over the same policy resolution he now challenges anew.  The Baltimore City Circuit Court, granting Harborview's motion for summary judgment, ruled that Harborview's policy resolution was "proper and lawful, at least to the extent that it prohibits employees of certain law firms engaged in pending or threatened litigation against Defendant from attending Defendant board meetings, committee meetings, unit owner meetings, or any other meeting of Defendant."  (ECF No. 44, Ex. F).

Each element of *res judicata* is met here.  First, the parties, with the exception of Zalco (who appears in *Clark I* but not *Clark IV*), are the same in *Clark I* and *Clark IV*, and so, as discussed in the *res judicata* analysis *supra*, the plaintiffs and Cochran are in privity with the parties in *Clark IV*.  Second, as demonstrated by the Circuit Court's holding, the claims here and in *Clark IV* are identical.  Lastly, the Circuit Court's grant of summary judgment for Harborview in *Clark IV* was a final judgment on the merits.  Plaintiffs argue that the last requirement is not met because *Clark IV* is on appeal, but given that "[a] final judgment retains its res judicata

---

[17] Plaintiffs also allege that Cochran retaliated against them by stationing a police officer outside the door at Delorme's deposition.  (*See* ECF No. 67, p. 7 n.5).  This allegation, however, appears nowhere in the complaint, and is thus, not properly before the Court.

consequences pending a decision on appeal," this argument fails. *Cognate Bioservices, Inc. v. Smith*, No. 13-1797, 2016 WL 915506, at *9 (D. Md. Mar. 10, 2016) (citing Maryland case law). Accordingly, plaintiffs' FHA retaliation claim with respect to Harborview's policy resolution is barred by *res judicata*.

*        *        *

Taken together, none of the direct or circumstantial evidence presented by plaintiffs establishes that defendant Cochran retaliated against them for exercising their rights under the FHA. As such, I grant Cochran's motion for summary judgment as it relates to Count II of plaintiffs' complaint.

**CONCLUSION**

For the aforementioned reasons, Cochran's motion for summary judgment (ECF No. 44) is granted. Moreover, because of Harborview's bankruptcy filing, the case is stayed and administratively closed as to the last two defendants, Harborview and Zalco. A separate order follows.


_____3/23/2016_____            _____/s/_____
Date                                         J. Frederick Motz
                                             United States District Judge